## Richmond

### ANTHONY F. TROY, ATTORNEY GENERAL OF VIRGINIA v. CHARLES B. WALKER, COMPTROLLER OF VIRGINIA

January 13, 1978.

Record No. 771506.

Present: I'Anson, C.J., Carrico, Harrison, Cochran, Harman and Compton, JJ.

*Anthony F. Troy, Attorney General (Walter A. McFarlane, Deputy Attorney General; J. Westwood Smithers, Jr., Assistant Attorney General; John S. Morris, III, Assistant Attorney General,* on brief, for petitioner.

*James C. Roberts (D. Eugene Webb, Jr.; Gary J. Spahn; Mays, Valentine, Davenport & Moore,* on briefs), for respondent.

*Amicus Curiae: Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees; Lawrence G. Hampton; and Carey Williams (Lee F. Davis, Jr.; Christian, Barton, Epps, Brent & Chappell, on brief), for respondent.*

COCHRAN, J., delivered the opinion of the Court.

The Attorney General has initiated, pursuant to Code § 8.01-653 (Repl. Vol. 1977), this mandamus proceeding seeking a determination that Chapter 599 of the 1977 Acts of Assembly (the Enabling Act),[1] and agreements made pursuant thereto, are valid and constitutional.

The facts are not in dispute. On January 4, 1971, and October 29, 1971, the Peninsula Ports Authority of Virginia (PPAV) and the Virginia Port Authority (VPA) executed the Port Unification Contract providing for the transfer by PPAV to VPA of certain port facilities within the City of Newport News (the City). VPA assumed the rights and obligations of PPAV as lessor under leases of the facilities to The Chesapeake and Ohio Railway (the Railway), and the obligation of PPAV to pay the outstanding principal and interest on revenue bonds issued in 1965 and 1971 by PPAV to finance the acquisition, construction, and improvement of the port facilities.

Under the lease agreements the Railway is obligated to pay as Basic Rent an amount equal to the principal, interest, and any redemption premium on the revenue bonds as they become due, and as Additional Rent an amount equal to the necessary expenses of an annual engineering inspection and the expenses incidental to the administration of the trust agreements

---

[1] Acts 1977, c. 599 provides in part as follows:

"§ 1. The city of Newport News and the city of Hampton are authorized, in the exercise of powers vested under applicable law and their charters, including Chapter 46 of the Acts of Assembly of Virginia of 1952, as amended, to enter into agreements with Virginia Port Authority and contract obligations thereunder for making donations of funds to Virginia Port Authority, from tax revenues or from other revenues or funds available therefor, over a period of more than one year in connection with the publicly owned regional project comprising the port facilities in the Newport News-Hampton area which have been financed with revenue bonds heretofore issued by Peninsula Ports Authority of Virginia. Such donations may be in such amounts and may be made available for the payment of all or any part of the principal of and the interest and any redemption premium on said revenue bonds, as shall be provided in said agreements."

securing the bonds. This obligation of the Railway continues as long as any revenue bonds remain outstanding, even if the leases are terminated by the lessor pursuant to the lease agreements.

The cargo tonnage shipped through the port facilities has declined in recent years, and VPA, concerned over the detrimental effect on the economy of inadequate use of the facilities, as evidenced by a letter dated September 20, 1977, from VPA to the Railway, has sought to replace the Railway with a more aggressive operator. This letter, which was also signed by the Chairman of the Board of the Railway, stated that the Railway had been unwilling to expend corporate resources to promote "truck traffic as such in connection with the operation" of the port facilities or "to promote or solicit any new business or to retain certain types of business . . . which are unprofitable."

On the same date, VPA and the Railway entered into a contract which provides that the Railway shall surrender possession of the port facilities to VPA and shall thereafter be relieved of its obligation as lessee to operate, repair, and maintain the facilities. Although the Railway remains liable for rents required to satisfy VPA's obligation on the outstanding revenue bonds, VPA agrees to pay the amount of such rents, to the extent that it is able to do so, from revenues derived from the subsequent lease to a new operator, contributions from the City, and appropriations from the General Assembly, and payments by the Railway shall be required only to the extent that such revenues are not adequate.

VPA also entered into an agreement dated September 20, 1977, with the City which provides that after surrender of possession by the Railway the City will grant to VPA sums sufficient to make up any deficiency in funds available to VPA to pay the costs of operation, repair, and maintenance of the port facilities and the amount of principal, interest, and redemption premiums on the revenue bonds as they become due and payable. The City's obligation to provide sufficient funds for the payment of the costs of operation, repair, and maintenance of the port facilities and the expenses otherwise payable from Additional Rent is limited to $200,000 in each year during which any of the 1965 bonds are outstanding, and $100,000 in each year thereafter during which any of the 1971 bonds are outstanding. The total amount of the City's obligation under the agreement, which continues until the bonds are paid in full or sufficient

funds for their payment are held in trust, shall not exceed at any time the lesser of (a) $10,000,000, or (b) the total principal amount of the bonds then outstanding, the total amount of accrued interest, and any redemption premium payable thereon. Payments by the City shall be required only to the extent that revenues from leases and other funds lawfully available, including appropriations from the General Assembly, are not adequate.

VPA agrees to reimburse, to the extent that it is able, first the Railway and then the City amounts paid by them to VPA after the Railway has surrendered possession of the port facilities.

Through competitive bidding VPA found a tenant, Nacirema Operating Co., Inc. (Nacirema), which has agreed to operate the port facilities as lessee in place of the Railway, under terms and conditions not specified in the record, provided its proposal is accepted not later than January 30, 1978.

VPA incurred the obligation to pay for printing the three documents dated September 20, 1977, evidencing the arrangement whereby the Railway would surrender possession of the port facilities, i.e., the letter from VPA to the Railway, the contract between VPA and the Railway, and the contract between VPA and the City. Upon presentation by VPA of the voucher for payment, the Comptroller declined to issue a warrant authorizing payment of the printing bill, and notified the Attorney General in writing that he entertained doubts as to the validity of the agreements between VPA and the Railway and the City, in view of this clause (the "credit clause") of Article X § 10 of the Constitution of Virginia (1971), which provides:

> "Neither the credit of the Commonwealth nor any county, city, town, or regional government shall be directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association, or corporation; . . . ." [2]

---

[2] In succeeding clauses Article X § 10 prohibits the Commonwealth or any such unit of government from subscribing to or becoming interested in the stock or obligations of any company, association, or corporation for the purpose of aiding in the construction or maintenance of its work (the "stock or obligations clause"); prohibits the Commonwealth from becoming a party to or interested in any work of internal improvement except as specified (the "internal improvements clause"); and provides that the Commonwealth shall neither "assume any indebtedness of any county, city, town, or regional government, nor lend its credit to the same" (the "local credit clause").

■ On motion, we granted leave to Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees, and Lawrence G. Hampton and Carey Williams, to file a brief *amicus curiae* which, *inter alia*, challenges the jurisdiction of the Court. This challenge is without merit. We hold, as indeed both the Attorney General and the Comptroller have argued, that the Court has jurisdiction under Code § 8.01-653.[3] We turn, therefore, to a consideration of the petition on its merits.

The Attorney General argues that the Enabling Act, and the implementing contractual obligations, are valid in that the donations to be made by the City will serve a public purpose, will constitute a governmental function, are not intended to aid a private corporation, and do not violate the provisions of the "credit clause" of Article X § 10 of the Constitution.

The Comptroller, conceding that the purpose of the Enabling Act to permit VPA and the City to provide better service to the public through the port facilities is both lawful and commendable, nevertheless contends that the Act is unconstitutional in its application to the agreements made pursuant thereto. Specifically, the Comptroller says that the contractual arrangement under which VPA and the City will guarantee payments on the revenue bonds primarily benefits the Railway, and thus violates the public purpose doctrine of the Fourteenth Amendment to the United States Constitution and the "credit clause" of Article X § 10 of the Virginia Constitution. He argues also that the tripartite arrangement is not reasonably

---

[3] Code § 8.01-653, formerly § 8-714, provides that where the Comptroller has doubt respecting the proper construction or interpretation or constitutionality of any act of the General Assembly which appropriates or directs the payment of money out of the State Treasury, a mandamus petition may be filed to obtain the Court's ruling on the question. While it is true, as the *amicus* brief asserts, that Acts 1977, c. 599 does not explicitly appropriate or direct the payment of money from the State Treasury, such purpose is necessarily implied. The act authorizes and contemplates donations by the City of Newport News to VPA, a political subdivision of the Commonwealth, and application by VPA of these donations on its bonded indebtedness. Such payments are required by Code § 2.1-180 to be paid into the State Treasury, from which disbursements may be made only upon warrants issued by the Comptroller. Code §§ 2.1-226 and 2.1-227. Moreover, sums appropriated by the General Assembly for the use of VPA in operating the port facilities may be disbursed only upon warrants issued by the Comptroller. Therefore, the Comptroller is empowered by Code § 8.01-653 to have the Court resolve his doubts concerning the constitutionality of Acts 1977, c. 599, and contractual obligations assumed in pursuance thereof.

necessary to accomplish the stated public purpose of the Enabling Act because the Railway is in default under its lease, and VPA and the City should have resorted to the remedy afforded by the lease, at the expense of the Railway, of evicting the Railway and reletting the facilities to another operator without reducing the full liability of the Railway for payment of rents securing the revenue bonds. The Comptroller further says that the contemplated appropriations by the General Assembly violate the "local credit clause" of Article X § 10 of the Constitution. Finally, the Comptroller suggests that the obligations require acts by VPA and the City exceeding the authority granted by the Enabling Act and are, therefore, *ultra vires*.

The *amicus* brief, in addition to raising the jurisdictional question, contends that the City is lending its credit to a private corporation, Nacirema, the proposed new lessee, in order to induce another private corporation, the Railway, to terminate a lease, in violation of the "credit clause".

The issues in this case have been narrowed by our decisions in three previous mandamus proceedings in which a pattern for financing the operation of port facilities in the Hampton Roads area has emerged.

In the first case, *Harrison* v. *Day*, 200 Va. 764, 107 S.E.2d 594 (1959), we held that ownership and operation of port facilities by Virginia State Ports Authority, a State agency, was a proper governmental function, and that appropriations by the General Assembly of public funds for that purpose did not violate the "internal improvements clause" of Section 185 of the 1902 Constitution, now Article X § 10 of the 1971 Constitution.

Thereafter, pursuant to statute, Virginia State Ports Authority contracted to purchase certain property of the Norfolk and Western Railway, to construct thereon port facilities with money obtained from the sale of revenue bonds payable solely from revenues derived from the facilities, which were to be leased back to the Norfolk and Western at a rental sufficient to amortize the bonds. The bonds bore a statement that neither the full faith and credit nor the taxing power of the Commonwealth was pledged. The Virginia State Ports Authority agreed, however, that it would urge the General Assembly at each session to make an appropriation, in the amount of 50% of

the basic rent, which would result in a proportionate reduction in the rent payable by the Norfolk and Western.

In the second port case, *Harrison* v. *Day*, 202 Va. 967, 121 S.E.2d 615 (1961), construing this arrangement, we reaffirmed the principle that acquisition, development, and operation of port facilities is a proper governmental function exercised for a public purpose. We held that leasing of the facilities to a private operator did not destroy the public purpose or convert the operation into a private function, even though some incidental benefit to a private individual may occur. We also concluded that the Commonwealth had not lent its credit in violation of the "credit clause" of § 185 of the 1902 Constitution, now Article X § 10 of the 1971 Constitution, since the General Assembly was not committed to making any appropriations and, under the terms of the lease, the lessee's rental payments were not to be reduced if such State appropriations were not made.

This kind of plan for financing port facilities was extended beyond permissible limits, however, in an agreement entered into by PPAV, the Railway, and the City, pursuant to another enabling act, Acts 1964, c. 39. There, PPAV agreed to acquire port facilities from the Railway, to construct additional facilities, and to lease all the facilities back to the Railway for an annual rental sufficient to pay 50% of the amount required to discharge the annual obligation in respect to the revenue bonds to be issued by PPAV. The City agreed to pay the "Bond Requirement Deficiency", being the remaining 50% of the annual bond obligation, less any appropriations made by the General Assembly.

This financing arrangement was considered by us in the third port case, *Button* v. *Day*, 205 Va. 629, 139 S.E.2d 91 (1964), where we held that the enabling act, which authorized the City to assume a "contingent liability", was not unconstitutional. We stated that under the act the State did not lend its credit, directly or indirectly, or assume any indebtedness of any county, city or town, or lend its credit to the same in violation of the "local credit clause" of § 185, in that any appropriations made by the General Assembly which would reduce the City's liability would be entirely voluntary. Moreover, since we had previously held that State appropriations for the operation of port facilities were not in violation of § 185 of the Constitution, we held that appropriations by the City, a political subdivision of the State,

for the same public purpose likewise would not violate that constitutional provision. Nevertheless, we found that the agreement exceeded the authority of the enabling act by imposing an absolute rather than a contingent liability on the City, in that the City agreed to pay the obligation to PPAV notwithstanding the failure of PPAV to receive a grant of funds from other sources and thus became primarily and absolutely liable. Accordingly, we held that the City's obligation exceeded the debt limitation mandated by § 127 of the 1902 Constitution,[4] and was invalid.

■ We agree with the Attorney General that the third port case has eliminated the "local credit clause" of Article X § 10 as an issue in the present case. Neither the Commonwealth nor VPA is lending credit to the City or assuming any indebtedness of the City in violation of this constitutional provision. No binding commitment is made by the General Assembly to appropriate public funds, and any appropriations that are made will be made on a voluntary basis. The City is authorized by the Enabling Act to make donations to VPA to assist in carrying out its governmental objectives, and appropriations by a city for such purposes have been held to be valid by the third port case. The question is whether the agreements executed pursuant to the Enabling Act require donations by the City for a public purpose or for the benefit of a private corporation.

Although the Comptroller on brief, citing *Green* v. *Frazier*, 253 U.S. 233 (1920), contended that the tripartite financial arrangement violated the public purpose doctrine of the Fourteenth Amendment to the United States Constitution, he did not pursue this theory in oral argument. In *Green*, the Supreme Court held that the States have no authority to tax for merely private purposes. So we may assume, without further discussion, that if the agreements in the present case violate the "credit clause" of Article X § 10 of the 1971 Virginia Constitution they also violate the public purpose doctrine of the Fourteenth Amendment. We will confine our consideration to the Virginia constitutional provision.

---

[4] The parties in the present case agree that under Article VII § 10(a)(4) of the 1971 Constitution the liability of the City for contributions to VPA would not be included in determining the debt limitation of the City.

We have held that when the underlying purpose of the financial commitment is to benefit the general public, there is no violation of the "credit clause", even though a private individual or corporation may incidentally benefit therefrom. *Harrison* v. *Day, supra,* 202 Va. at 974, 121 S.E.2d at 620; *Almond* v. *Day,* 197 Va. 782, 791, 91 S.E.2d 660, 667 (1956). Indeed, the Comptroller concedes that if we determine that the dominant purpose of the contractual obligation assumed by the City was to aid VPA in operating the port facilities, then there is no violation of the "credit clause". However, he argues that the dominant purpose was to benefit a private corporation, the Railway, by granting the credit of the City to the Railway in order to terminate an unsatisfactory operation.

The Comptroller relies on *Button* v. *Day,* 208 Va. 494, 158 S.E.2d 735 (1968), in which we held that the enabling act, Acts 1966, c. 689, which created the Virginia Industrial Building Authority and authorized it to guarantee loans made by commercial lenders to private firms, violated the "credit clause". Although we acknowledged the laudable public purpose of the act to stimulate the development of industry, we concluded that the method of accomplishment was not a proper governmental function, because the legislative intent revealed in the language of the act was to grant State credit to private interests which could not themselves obtain credit, in direct violation of the "credit clause" of Section 185.[5] But in the present case, we hold that the dominant purpose of the Enabling Act and the implementing agreements is to develop, improve, and expand in the public interest the business of the port facilities. The Railway is not seeking to obtain any credit. The City is granting its credit to assist VPA, a political subdivision of the Commonwealth, to attain the common objective of replacing a tenant, under whose operation the business of the facilities has deteriorated, with a more innovative, aggressive, and competitive operator.

■ We do not agree that there was a preferable alternative available that made it unnecessary for VPA and the City to

---

[5] Following this decision, an amendment to Section 185, initiated by the 1966 General Assembly which approved Acts 1966, c. 689, the enabling act under which the Virginia Industrial Building Authority was enacted, was approved. As amended, the section permitted the General Assembly to establish an authority with power to insure and guarantee loans to finance industrial development and to appropriate funds thereto. This provision is retained in Article X § 10 of the 1971 Constitution.

enter into the agreements under which the City, in effect, guaranteed payment of the revenue bonds backed by the Railway's rental commitments. The Comptroller bases this argument on his assumption that the Railway was in default under its lease. In the event of default, VPA may, under the lease provisions, at the Railway's expense, require the Railway to surrender possession, and may relet the facilities, the Railway remaining fully liable for its rental payments securing the bonded indebtedness.

The Comptroller's assumption that the Railway was in default finds little support in the record. The statement in the letter of September 20, 1977, on which the Comptroller relies, as to the Railway's unwillingness to promote truck traffic or to solicit new business or to retain unprofitable types of business, is not an admission of default. We find no specific provision in the lease that requires the Railway to perform any of these acts.[6] The Railway is operating the port facilities, and whether there has been any admission by the Railway of default is, at least, highly questionable. Moreover, as the Attorney General observed, Section 3.03 of the lease appears to establish a presumption that the facilities are being operated in compliance with the lease, unless and until it has been otherwise determined by a governmental regulatory body or agency. No such determination has been made. And under Section 9.01 of the lease, an event of default must continue without correction for 30 days after written notice has been given to the Railway, before action may be taken by VPA.

With knowledge of the conditions under which the port facilities were being operated, VPA and the City chose to replace the Railway with another operator by means of the agreements now under consideration. VPA and the City were the public entities charged with the responsibility for making what we

---

[6] Section 3.01 of the lease, on which the Comptroller also relies, provides as follows:

"The Railway agrees that it will, at all times during the term hereof, operate (or cause to be operated . . .) the Newport News Port Facilities as port terminal facilities for use in connection with the transportation, receipt, delivery, interchange, servicing and storage of import, export, intercoastal and coastwise general cargo by the general public (including, but not limited to, cargo shippers and receivers, the Railway, other railroads, trucks, vessels and other transportation agencies), on a fair and reasonable basis, free of any unreasonable or unjust discrimination."

perceive to have been a policy decision. They were not afforded the luxury of taking unlimited time to consider alternative remedies. They were confronted with a deteriorating business enterprise presenting a problem of critical proportions that required prompt resolution. The economy of the region and of the entire State was involved. According to the affidavit of the Chairman of the Board of Commissioners of VPA, the tonnage hauled at these port facilities has fallen from a high of approximately 600,000 tons in one year to an estimated 200,000 tons for the year 1977; business has been lost to competing ports; and in view of the declining business Nacirema cannot be expected to extend its offer to operate the facilities beyond the specified deadline of January 30, 1978.

Under these circumstances, we cannot say that it was not reasonably necessary for VPA and the City to reach an amicable agreement with the Railway for prompt surrender of the premises rather than pursue the unilateral course advocated by the Comptroller of attempting to evict the Railway and thus accept the intolerable hazard of protracted litigation during which the erosion of business would continue and the port facilities would become less attractive to prospective operators. Whether the policy decision made by VPA and the City was the wisest possible choice may be debatable, but that question is not for us to determine. *See Harrison* v. *Day*, 202 Va. at 972-73, 121 S.E.2d at 619. We cannot say that the decision was arbitrary or unreasonable, or that it constituted an abuse of discretion. We hold, therefore, that the agreements were executed for the proper public purpose of assisting VPA in carrying out its governmental functions, and that they do not violate the "credit clause" of Article X § 10 by lending credit for the benefit of the Railway.

■ It follows that we reject the argument of the *amicus curiae* that the agreements constitute a device or pretense whereby the City's credit is indirectly granted to or in aid of the proposed new operator, Nacirema, in violation of the "credit clause". The *amicus* brief says that the City used its credit to obtain the replacement of the Railway by Nacirema, a result which Nacirema could not have accomplished on its own credit. This purpose, if established, would bring the case within the purview of *Button* v. *Day, supra,* 208 Va. 494, 158 S.E.2d 735, in which the 1966 Virginia Industrial Building Authority enabling

act was invalidated. But, as we have shown, the present case is distinguishable. There, the Building Authority was empowered to guarantee loans from one private corporation to another. Here, the City has agreed to make up any short-fall in revenues required to pay VPA's bonded indebtedness obligations. The City is assisting VPA to meet these obligations. No credit is being lent to Nacirema. VPA advertised for public bids for an operator of the port facilities, and Nacirema, which submitted the highest bid, was selected. Nacirema is not obligated to pay the revenue bonds. It has merely offered to operate the port facilities under a new lease agreement if the facilities can be made available to it promptly.

■ Finally, the Comptroller, conceding the facial constitutionality of the Enabling Act, argues that the agreements exceed the authority granted by the Act and are *ultra vires*. We disagree.

The Comptroller first contends that the City's obligation to make payments is unconstitutional and thus *ultra vires*. But, as we have heretofore demonstrated, this obligation could be assumed by the City without violating the Constitution. The Comptroller then says that the agreements exceed the parameters of the Enabling Act in other specific ways. For example, he asserts that VPA has no authority to agree in Section 12 of the contract with the Railway to exert its best efforts to enforce all penalties and remedies against the new lessee in the event of default, rather than to exercise its discretion to determine whether to invoke such provisions. It is quite true that no specific authority is granted VPA by the Enabling Act to make leases with clauses differing from or inconsistent with provisions in leases previously executed by VPA. Nevertheless, Code §§ 62.1-133 through 62.1-137 grant comprehensive powers to VPA to develop, maintain, and improve port facilities and to do whatever may tend to be useful for this purpose and for the purpose of increasing foreign and domestic commerce. Under this broad grant of power, maximum flexibility was given to VPA to determine the nature and extent of the contractual obligations required to carry out its mission. Accordingly, we hold that VPA has not acted *ultra vires* in entering into the agreements. And the City, authorized by § 62.1-134(f) to make grants to VPA for its purposes, has not acted *ultra vires* in obligating itself to make the required

donations for the more limited purpose authorized by the Enabling Act.

For the reasons assigned, the petition for a writ of mandamus will be

*Granted.*