**W.W. REASOR, Jerry W. Adams, Michael W. McCabe, and Harry T. Lester, Individually and as Partners of Raml Associates, a Virginia General Partnership, and, with respect to Jerry W. Adams, Michael W. McCabe and Harry T. Lester, as Partners of Adams, McCabe & Lester, a Virginia General Partnership, Plaintiffs,**

v.

**The CITY OF NORFOLK, VIRGINIA, A Virginia Municipal Corporation,**

and

**Norfolk Redevelopment and Housing Authority, a Virginia Redevelopment and Housing Authority,**

and

**Goodman-Segar-Hogan, Incorporated, a Virginia Corporation, Defendants.**

Civ. A. No. 84–3–N.

United States District Court, E.D. Virginia, Norfolk Division.

July 18, 1984.
Supplemental Order Oct. 5, 1984.

Everette G. Allen, Jr., Hirschler, Fleischer, Weinberg, Cox & Allen, Richmond, Va., for plaintiffs.

William T. Prince, Norfolk, Va., for City.

Walkley E. Johnson, Jr., Norfolk, Va., for NRHA.

Hunter W. Sims, Jr., Norfolk, Va., for Goodman-Segar.

## OPINION AND ORDER

CLARKE, District Judge.

This matter comes before the Court on the motion to dismiss and for summary judgment filed by the defendant, City ("City"). The plaintiffs have filed a brief in opposition to the City's motion, the City then filed reply briefs, and oral argument was heard on the motion. Accordingly, the issues are ripe for disposition.

The plaintiffs, partners of a realty firm, filed this suit against the City, Norfolk Redevelopment and Housing Authority, and Goodman-Segar-Hogan, Inc., a rival realty corporation, on January 4, 1984. The forty-two page complaint asserted thirteen different grounds for relief. The background of the dispute is that the City acquired part of a tract of land owned by the plaintiffs and constructed a parking garage, Garage Site I, on that land. At the time of the sale, the plaintiffs negotiated with the City concerning the City's desire to acquire a second parcel of the plaintiffs' land and the plaintiffs' desire to erect an office building in the airspace over the proposed parking garage on the second parcel of land (Garage Site II A). Those negotiations fell through and eventually resulted in this suit in which plaintiffs allege, in part, violations of state and federal anti-

trust statutes, relocation statutes, and breach of contract.

The Court begins its analysis by observing that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts" which would entitle him to relief. *See, Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Summary judgment can only be granted "where it is perfectly clear that there is no dispute about either the facts of the controversy or the inferences to be drawn from such facts." *Morrison v. Nissan Motor Co.*, 601 F.2d 139 (4th Cir.1979). The plaintiffs have filed an affidavit stating they are unable to produce affidavits on several issues. Fed.R.Civ.P. 56(f). The Court will consider that proposition when it deals with the affected counts of the complaint.

The Court will examine the motion to dismiss and for summary judgment on each count separately in the same order and grouping as they appear in the City's brief.

*Contract Claims—Counts 1, 2, 4 and 6*

■ Counts 1, 2 and 4 of the complaint each request the Court to enforce the "Condemnation Agreement" which allegedly allowed the City to buy the plaintiffs' property and construct a parking garage, Garage Site I, and in return required the City to allow the plaintiffs to construct an office building over the parking garage on Garage Site IIA.

Count 6 seeks a recision of the sale of Garage Site I because the City allegedly failed to meet its obligations under the "Condemnation Agreement." The City has moved for summary judgment on Counts 1, 2, 4 and 6 contending that there is no "Condemnation Agreement." The plaintiffs allege that the "Condemnation Agreement" consists of two written documents, the Statement of Principles and the Memorandum of Understanding, along with various oral representations and agreements made by the parties.

The Court DENIES the motion to dismiss and for summary judgment on Counts 1, 2, 4, and 6 of the complaint. The complaint alleges that the parties had agreed to a "condemnation agreement" which allowed the City to acquire Garage Site I without the use of condemnation proceedings. Whether the parties' minds had met is a disputed question of fact on the record before the Court at this time. *Charbonnages de France v. Smith*, 597 F.2d 406 (4th Cir.1979). Thus summary judgment is not appropriate on Counts 1, 2, 4, and 6 at this time because the existence of a "condemnation agreement" is an unresolved question of fact.

*Relocation Benefits—Counts 3 and 4*

■ In Counts 3 and 4, the plaintiffs seek relocation assistance pursuant to the Housing Act of 1949, 42 U.S.C. § 1455(c), and Section 25–235 *et seq.* of the Virginia Code. The City has moved to dismiss Counts Three and Four on the grounds that the plaintiffs are not "displaced persons," the project was not federally funded and plaintiffs have failed to exhaust administrative remedies. The plaintiffs Reasor, Adams, McCabe and Lester, trading as RAML Associates, have failed to state a claim for relief in Count 3 or 4 because they are not displaced persons. The relocation benefits are afforded to "displaced" persons. A displaced person is a person who "moves" as a result of an acquisition or written order to vacate. *See*, 42 U.S.C. § 4601(6); Va.Code § 25–238(c). "Displaced" persons include occupants, but not owners. *City of Mishawaka v. Knights of Columbus Home Association of Mishawaka*, 396 N.E.2d 948, 950 (Ind.Ct.App.1980). RAML has never even alleged that they were occupants of the property thus RAML's claims under Counts 3 and 4 are DISMISSED for failure to state a claim. The plaintiffs, Adams, McCabe and Lester, partners of Adams, McCabe and Lester ("AML") have alleged that they were forced to move as a result of the City's agreement to purchase the property where AML was located. Thus, AML, unlike RAML, may have a valid cause of action because AML's occupancy was terminated. Whether AML moved as a result of the City's acquisition

or written order to vacate is a disputed question of fact.

■ The defendants assert that AML, the sole surviving plaintiff in Counts 3 and 4, must exhaust its administrative remedies before bringing this suit.

Federal statutes provide for payment of benefits to displaced persons upon application for relocation benefits. 42 U.S.C. § 4622. The Virginia statute implies that the displaced person must seek payment of benefits. Va.Code § 25–239; *Boston v. United States*, 424 F.Supp. 259 (E.D.Mo. 1976). AML has not alleged that they have applied for benefits. AML's claim for moving expenses has not been presented to any administrative agency. Thus, AML's claim for relocation benefits is DISMISSED without prejudice for failure to exhaust administrative remedies. 42 U.S.C. § 4633(b)(3), 24 C.F.R. §§ 42.225(h), 42.703(a)(b), 42.711; *Olivares v. Martin*, 555 F.2d 1192, 1196 (5th Cir.1977). The plaintiffs' reliance on *M.M. Crockin Co. v. Portsmouth Redevelopment & Housing Authority*, 437 F.2d 784 (4th Cir.1971), is misplaced because the plaintiff in that case challenged the agency's approval of a relocation plan. In this case, the plaintiff complains of the City's failure to award the plaintiff moving expenses and other relocation benefits, yet such a claim is obviously dependent upon a request by the plaintiff and no such request has been alleged.

The plaintiffs, Adams, McCabe and Lester, have also asked this Court to enforce the "Condemnation Agreement" as effective relocation assistance in Counts 3 and 4. To the extent AML seeks damages for the defendants' allegedly wrongful denial of relocation assistance, AML need not exhaust administrative remedies. *M.M. Crockin Co. v. Portsmouth Redevelopment & Housing Authority, supra.* Unlike relocation benefits, e.g., moving expenses, denial of relocation assistance may not be reviewable by an administrative agency. 24 C.F.R. § 42.703(a). Thus, the Court refuses to require exhaustion on the claims for relocation assistance, as distinguished from relocation benefits.

The City has also urged dismissal on the ground that no federal funds were used in the acquisition and construction of the garage on Garage Site I. The plaintiffs have filed an affidavit under Rule 56(f) stating they are unable, at this time, to produce affidavits concerning the use of federal funds. Accordingly, the Court DENIES the motion for summary judgment and to dismiss at this time. The plaintiffs are advised to make a timely compliance with the requirements of the newly revised Rule 11. Fed.R.Civ.P. The plaintiffs should further be on notice from the number of attorneys present at the hearing on this motion as well as the length of the briefs in this case, that plaintiffs' counsel may also expose themselves to extensive liability if they fail to comply with the requirements of this rule.

Thus, the Court has dismissed Reasor, Adams, McCabe and Lester as plaintiffs from Counts 3 and 4 with prejudice, has dismissed Adams, McCabe and Lester's claim for relocation benefits, such as moving expenses, without prejudice, and has declined to dismiss the claims of AML alleging denial of relocation *assistance* under Counts 3 and 4.

### Declaratory Judgment—Count 5

■ In Count Five, plaintiffs seek a declaratory judgment that if the City uses condemnation to acquire RAML's property, Garage Site IIA, that the City be limited to the amount of airspace above the property as is necessary to construct a garage and that the City provide for ingress and egress to a building site to be titled in RAML, above the proposed parking garage. The City contends that it cannot be ordered to limit its acquisition of property by eminent domain to accommodate the development by plaintiffs. In their brief in opposition the plaintiffs state "plaintiffs merely seek a declaration that should RAML's property be condemned by the City, it do so in a constitutional manner." This Court will not enter a declaratory judgment that a party must act in a "constitutional manner" because such a judg-

ment would not resolve any controversy between the parties. *See McGraw-Edison Co. v. Preformed Line Products Co.*, 362 F.2d 339, 342 (9th Cir.), *cert. denied,* 385 U.S. 919, 87 S.Ct. 229, 17 L.Ed.2d 143 (1966). The City and the plaintiffs agree that the City must act in a constitutional manner. The controversy is whether it is unconstitutional for the City to obtain fee simple interest, including rights to the airspace, in the plaintiff's property through eminent domain.

In an action for declaratory judgment, the burden of proof is not put on the plaintiff merely because he has filed the action, rather the Court must examine the underlying issues to determine the burden of proof. *See Royal Indemnity Co. v. Wingate,* 353 F.Supp. 1002, 1004 (D.Md.), *aff'd.* 487 F.2d 1398 (4th Cir.1973). In its brief the City concedes that the City bears the burden of establishing the necessity of the condemnation in a condemnation proceeding. By analogy, the City bears the burden in this declaratory judgment action because the underlying issue involves the propriety of a condemnation. The City's motion for summary judgment and to dismiss Count 5 of the complaint is DENIED because Count 5 states a colorable claim for relief and the City has failed to establish, at this point, the necessity of the challenged condemnation.

*Antitrust Claims—Counts 7 through 11*

In Counts 7 through 11, the plaintiffs have alleged that the City has violated the Sherman Act and the Virginia Antitrust Act. 15 U.S.C. §§ 1 and 2; Va.Code §§ 59.1–9.5, 9.6; § 18.2–500.

The City contends that it is immune to antitrust liability under the *Parker* doctrine. *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Although the parties are in dispute as to the law, there is no real controversy as to the applicable facts in this case. Therefore, the Court will examine the applicable caselaw.

1. *State Action Doctrine*

The state action doctrine was established by the Supreme Court in *Parker v. Brown, supra.* The rationale for *Parker* was that the Sherman Act did not restrain state legislative action. The Supreme Court and the Courts of Appeals are currently grappling with the question of when state action immunity is available to actors other than the state itself. In *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) the plurality held that a municipality acquired antitrust immunity when it acted pursuant to a "clearly articulated and affirmatively expressed" state policy to displace competition. *Id.* at 410, 98 S.Ct. at 1135.

The second prong of the state action immunity test requires state supervision of the challenged activities allegedly performed by the non-state actor. *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 99, 100 S.Ct. 937, 940, 63 L.Ed.2d 233 (1980); *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 582, 96 S.Ct. 3110, 3113, 49 L.Ed.2d 1141 (1976). The City contends that the supervision prong applies only to private actors but does not apply to municipalities. The Supreme Court in *Boulder,* expressly reserved the question of whether a local municipality must satisfy the "active state supervision" requirement. *Community Communications Co. v. Boulder,* 455 U.S. 40, 51–52 n. 14 (majority), 71 n. 6 (dissent), 102 S.Ct. 835, 840–841 n. 14, 851 n. 6, 70 L.Ed.2d 810. Neither party has cited any Supreme Court case which has resolved this issue. In *Hoover v. Ronwin,* — U.S. ——, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984) the defendant was a state actor so the Supreme Court did not need to reach the supervision prong.

A number of Circuit Courts have concluded that the state supervision prong should not be required of municipalities. *See, e.g., Scott v. City of Sioux City,* 736 F.2d 1207, 1984–1 Trade Cases paragraph 66050, June 8, 1984 (8th Cir.1984); *Golden State Transit Corp. v. City of Los Ange-*

*les,* 726 F.2d 1430 (9th Cir.1984); *Town of Hallie v. City of Eau Claire,* 700 F.2d 376 (7th Cir.1983).

■ The Court HOLDS that the state supervision need not be proved by a municipality to establish *Parker* immunity. As the United States Court of Appeals for the Eighth Circuit observed in *Sioux City, supra,* municipal officials are supervised by the citizens they represent thus state supervision is less necessary to prevent abuse of power. *Sioux City, supra,* at 1214. Moreover, the state supervision prong tests whether an activity is truly state action yet this test is already performed for a municipality when the Court examines whether the action was authorized. *Id.* Accordingly, the Court turns to the issue of whether the state authorized the City to act in that area and whether the state legislature contemplated the anticompetitive acts complained of.

### 2. *State Authorization*

■ The plaintiffs have supported their antitrust claims with 126 paragraphs of allegations. When the wheat is separated from the chaff, the plaintiffs allege that the City conspired with Goodman-Segar-Hogan and others to prevent the plaintiffs from erecting an office building in downtown Norfolk.

In the agreement filed with the Court, Goodman-Segar-Hogan agreed to erect an office building in downtown Norfolk and the City agreed not to construct, permit the construction of, or provide any financial support for the construction of a certain size office building in a specified area of downtown Norfolk for up to two years after completion of the Goodman-Segar-Hogan building. The plaintiffs argue that this "blackout" agreement and the City's subsequent failure to aid the plaintiffs in constructing an office building, violates the Sherman Act and the Virginia Antitrust Act.

In enacting the housing and redevelopment sections of the Virginia Code, the state legislature made express findings and declarations. Va.Code §§ 36–48, 36–48.1.

In those sections the legislature expressly stated that clearance, replanning, rehabilitation and reconstruction of blighted areas in accordance with locally approved redevelopment plans are governmental functions of grave concern to the Commonwealth. Va.Code § 36.48. The legislature created housing and redevelopment authorities to accomplish the redevelopment. Va. Code §§ 36–49 through 36–51.1, 36–52.1 through 36–55. The legislature also contemplated that the cities would be inexorably tied into the redevelopment.

The redevelopment authorities were not allowed to initiate a conservation or redevelopment plan until the city approved the plan. Va.Code §§ 36–51, 36–51.1, 36–52.1. The redevelopment authorities were not allowed to exercise certain powers until the city adopted a resolution declaring that an area was deteriorating. Va.Code § 36–49.-1. Further, the city was the entity empowered to declare an area to be a rehabilitation district. Va.Code § 36–52.3. Most importantly, the legislature authorized the city to have the same rights and powers to cooperate with and assist the authorites in redevelopment that the city has under the Housing Law. Va.Code § 36–52, 36–6, 36–7, 36–7.1, 36–8. Thus, the City was empowered to do anything convenient to aid and cooperate in the planning, undertaking, construction or operation of a redevelopment project. Va.Code §§ 36–6(h), 36–52. Therefore, the "blackout" agreement and each of the other challenged actions, undertaken in an approved conservation district, were authorized by the legislature. Va. Code §§ 36–52, 36–6(h), (i), 36–53.

In their brief in opposition to the motion for summary judgment, the plaintiffs contend that even if the legislature authorized the anticompetitive acts challenged here, that the authorization violates the credit clause of the Virginia Constitution and the Virginia Constitution and statutes on public bidding.

The plaintiffs' conclusory claim of unconstitutionality is irrelevant or without merit. To the extent the plaintiffs challenge the

City's potential power to violate the credit clause, such a contention is irrelevant as to whether the specific anticompetitive acts alleged in the complaint were authorized by the legislature. The specific activities alleged to be anticompetitive do not violate the credit clause because they do not involve the loaning of credit. Under the section dealing with Count 13 of the complaint the Court concludes that the credit clause only applies to "credit" in the popular sense of that term. Accordingly, the Court FINDS that none of the allegedly anticompetitive activities involve a violation of the credit clause.

The Court likewise rejects the plaintiffs' contention that the City activities violate Virginia Constitutional and statutory provisions on public bidding. The plaintiffs' brief states in conclusory fashion that the City does not have all the power that it claims to have. The only relevant issue, however, is whether the challenged activities were forbidden by constitutional or statutory provisions. As the plaintiffs have failed to raise specific violations of constitutional or statutory provisions, this Court refuses to consider which of the City's potential powers may be limited by the Virginia Constitution and its executory statutes. Such a broad inquiry into the constitutionality of potential exercises of power by the City is directly in conflict with the principles of *Ashwander*. *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–84, 80 L.Ed. 688 (1936).

Accordingly, the Court HOLDS that the challenged activities were authorized by the state legislature. Unlike the neutral grant of home rule power at issue in *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), the above cited statutes required the City to become involved in redevelopment projects. The Court FINDS that the legislature has clearly articulated and affirmatively expressed its intent that the City engage in redevelopment and conservation activities. *Boulder, supra* at 51, 102 S.Ct. at 840. The next question is whether the state contemplated the anti-

competitive activities alleged in the instant case. *Lafayette, supra* 435 U.S. at 415, 98 S.Ct. at 1138 (plurality opinion).

### 3. *Contemplation of Anticompetitive Activities*

The State authorized the City to make loans and donations to the redevelopment authority and to purchase the bonds of such an authority. Va.Code §§ 36–52, 36–6(g), 36–7. Further, the legislature authorized the City to enter into agreements with redevelopment authorities as to action to be taken by the city and authorized the authority to make land available to private enterprise on any conditions necessary to carry out the purposes of redevelopment. Va.Code § 36–52, 36–6(i), 36–53. Once the City became financially legally obligated to the redevelopment, the state must have anticipated that the city would use its powers to protect its investment. *See, Scott v. City of Sioux City, supra,* at 1212. Further, it is clear that the reconstruction of an area pursuant to a redevelopment plan would necessitate some anticompetitive activities.

In its declarations, the state legislature expressly stated that the problems of urban blight required governmental action. Thus the state concluded that private enterprise alone could not solve the problem. Accordingly, the state gave Housing and Redevelopment Authorities and cities vast powers to acquire land, clear it, determine appropriate land use for different parcels, impose conditions and limitations under which property may be redeveloped by public or private enterprise, and generally plan the redevelopment of an entire area. Va. Code §§ 36–48 through 36–55. Clearly the legislature contemplated that the redevelopment plan would contain anticompetitive measures similar to the challenged "blackout" agreement. The legislature must have contemplated that the City would try to encourage private developers to invest heavily in redevelopment and that as part of that encouragement the City would agree not to aid in building competing structures. For example, the City may de-

sire a large hotel to be built in the downtown area. A private investor would build such a building based on the present office needs of the area, which would be low, due to blight. However, the City's redevelopment plan may be more farsighted and thus require a hotel that would not be fully occupied until a number of years after its constructions. In order to induce the private investor to construct a much larger building than is presently required the City would reasonably be expected to promise some limited form of protection from competition in the first few years after construction of the building. Thus, the challenged "blackout" agreement and the City's alleged refusal to cooperate with the plaintiffs is a form of limited protection from competition that the legislature must have contemplated when it authorized the City to become involved in redevelopment projects.

Accordingly, the Court FINDS that the legislature contemplated the allegedly anticompetitive activities challenged in this case when it authorized the City to become involved in redevelopment projects. Therefore, the Court HOLDS that the City was acting pursuant to a clearly articulated and affirmatively expressed state policy to displace competition in redevelopment projects. *Lafayette, supra.*

As the City has met the requirements of the *Parker* doctrine, Counts 7 and 8 are DISMISSED and summary judgment is GRANTED in favor of the City on those two counts.

In its brief in support of its motion for summary judgment, the City felt obliged to reply to the possible allegation that the City conspired to refuse to deal with the plaintiffs at any time under any circumstances. The plaintiffs have seized upon the City's discussion of that issue as an admission by the City that the City's activities would not be protected by state action immunity if the City conspired with a private actor. The Court is not sure that any claim of perversion of municipal activities was made in Count 7 or 8 of the complaint though it seems such a claim would be more appropriate under Count 12. Further, the plaintiffs have abandoned any claim of perversion of municipal activities, under Count 7 or 8, in their brief in opposition to the motion for summary judgment.

The plaintiffs' brief is woefully devoid of authority for the proposition that the Parker doctrine is inapplicable if the municipality conspires with a private actor. *See Community Communications Co. v. Boulder,* 455 U.S. 40, 44, 47, 102 S.Ct. 835, 837, 838, 70 L.Ed.2d 810 (1982) (In Section 1 of Sherman Act challenge to City's grant of monopoly to private actor Supreme Court did not discuss combination with private actor as basis for its decision.) Further, the Court has expressly found that the City's actions were authorized by the state, thus barring any *ultra vires* claim.

Counts 9 and 10 of the complaint assert violations of the Virginia Antitrust Act. Va.Code § 59.1–9.1, *et seq.* The Court GRANTS the City's motion for summary judgment on both Counts 9 and 10. The *Parker* immunity which foreclosed liability under the federal anti-trust act forecloses liability under the State Antitrust Act. Moreover, the Virginia Antitrust Act excludes any activity which is authorized by a Virginia statute. Va.Code § 59.1–9.4(b)(1). As this Court has already concluded that the City's action was authorized under the *Parker* analysis, the statutory exclusion, which is broader, because it does not require "clearly articulated and affirmatively expressed policy", must also apply.

Thus, the Court has dismissed the plaintiffs' claims under the Sherman Act and under the Virginia Antitrust Act.

*Virginia Conspiracy Act—Count 11*

 In Count 11, the plaintiffs have incorporated by reference the 126 preceding paragraphs of the complaint and add the allegation that the City has violated the Virginia Conspiracy Act. Virginia Code § 18.2–499. The City has moved for summary judgment on the grounds that the Virginia Conspiracy Act does not apply to cities, the city is not a person, the city's actions were not malicious, and that the

statute only supplements the Antitrust Act. The Court is not persuaded by the City's contention that a City is not a person within the meaning of the Virginia Conspiracy Act. Va.Code § 18.2–501. Nor is the Court convinced that the Virginia Conspiracy Act is solely supplemental to, and only governs conduct beyond, the Virginia Antitrust Act. Va.Code §§ 18.2–499 through 501; 59.1–9.1, *et seq.* However, Virginia case law is to the effect that the City is deserving of sovereign immunity while performing a governmental function. *Virginia Electric & Power Co. v. Hampton Redevelopment and Housing Authority,* 217 Va. 30, 225 S.E.2d 364 (1976). The legislature's opinion is not conclusive on the issue of whether the activity is a proprietary or governmental function. *Id.* In addition, a City may be beyond the scope of the Conspiracy Act if the challenged activities were performed by public officials within the scope of their employment. *See Fowler v. Department of Education,* 472 F.Supp. 121 (D.C.Va.1978). However, on the basis of the record at this time, the Court is unable to find that either defense has been proved as a matter of law, thus the motion for summary judgment is DENIED.

### Tortious Conspiracy—Count 12

In Count 12, the plaintiffs allege that the City willfully and maliciously conspired with others to hinder the plaintiff in the development of its property. *See Gallop v. Sharp,* 179 Va. 335, 19 S.E.2d 84 (1942). The City has submitted affidavits disclaiming any malice or ill will on the part of the City. The plaintiffs have replied by stating that they are unable to reply to the City's affidavits at this time. Fed.R.Civ.P. 56(f). As malice is one of the dispositive issues in Count 12, the Court DENIES the City's motions to dismiss and for summary judgment at this time.

The plaintiffs and plaintiffs' counsel are again advised to take note of the requirements of the newly revised Rule 11. Fed. R.Civ.P.

### Unconstitutional Contract—Count 13

In Count 13, the plaintiffs challenge the constitutionality of the contract between the City and Goodman-Segar-Hogan as a violation of the Virginia Constitution and Virginia statutes. Va. Const. art. 7, § 9, art. 10, § 10; Va.Code §§ 15.1–307 through 316.

The plaintiffs have alleged that the City violated the credit clause of the Virginia Constitution in paragraphs 2, 5, 6, 7, 12 and 14 of the agreement with Goodman-Segar-Hogan. Va. Const., art. 10, § 10. The City agrees that it granted incentives to Goodman-Segar-Hogan, but denies that those incentives can be termed credit. The City cites *Almond v. Day,* 197 Va. 782, 91 S.E.2d 660 (1956), as authority for the proposition that the term "credit" refers to the relation of borrower and lender, in which money is borrowed to be repaid at a later date with interest. The plaintiffs argue for a more expansive reading of the word "credit" but only cite *Troy v. Walker,* 218 Va. 739, 241 S.E.2d 420 (1978). *Troy, supra,* involved the City of Newport News' guarantee to pay the principal, interest and redemption premiums of certain bonds if other sources of payment were insufficient. Such a guarantee is certainly "credit" within the definition proposed by the City. Thus, in determining whether the challenged activities violated the credit clause of the Virginia Constitution the Court will be guided by the definition of "credit" in *Almond v. Day, supra. See, e.g., Button v. Day,* 208 Va. 494, 498, 158 S.E.2d 735, 738 (1968).

The plaintiffs contention that paragraphs 2, 5, 6, 12 and 14 of the Goodman-Segar-Hogan Agreement with the City violate the credit clause is wholly without merit. Those paragraphs do include certain economic inducements promised by the City but they are certainly not within the Virginia courts interpretation of the term "credit" which we have adopted above. Paragraph 7 of the agreement requires the City to construct a parking garage, which is not either of the garages mentioned earlier in this opinion, and lease a number of

spaces to Goodman-Segar-Hogan. This Court's interpretation of the term "credit" is not blind to the fact that credit can often be disguised as a lease. However, from an examination of the agreement the Court concludes that the lease in question is not a sham lease designed to disguise an extention of credit. The Court bases its conclusion on the absence of an option in Goodman-Segar-Hogan to buy those parking spaces for a nominal sum at the lease and the fact that the rental payments are to be fixed at the market rate. Accordingly, the Court HOLDS that the challenged provisions of the Goodman-Segar-Hogan Agreement do not violate the credit clause of the Virginia Constitution. Va. Const., art. 10, § 10.

The plaintiffs have challenged the Goodman-Segar-Hogan Agreement with the City on the ground that it violates Virginia constitutional and statutory provisions on public bidding. Va. Const. Art. 7, § 9, Va.Code § 15.1–307, *et seq.* The City has filed an affidavit which purports to demonstrate that several of the challenged provisions are now moot. The plaintiffs have responded, pursuant to Rule 56(f) Fed.R. Civ.P., by filing an affidavit stating that they are unable to respond at this time. The resolution of whether these provisions are still in effect may moot several constitutional issues. Accordingly, the Court, at this time, DENIES the motion to dismiss and for summary judgment on the claim that the Goodman-Segar-Hogan contract violates the constitutional and statutory provisions on public bidding. *See Ashwander, supra.*

### SUPPLEMENTAL ORDER

This matter comes before the Court on the motion for summary judgment filed by the defendant, Goodman-Segar-Hogan, Inc. ("GSH"). The plaintiffs have filed a brief in opposition to GSH's motion, GSH then filed reply briefs, and oral argument was heard on the motion. Accordingly, the issue is ripe for disposition.

The plaintiffs, partners of a realty firm, filed this suit against the City of Norfolk, Norfolk Redevelopment & Housing Authority (NRHA) and GSH, a rival realty corporation, on January 4, 1984. The background of the dispute is as follows. The City acquired part of a tract of land owned by the plaintiffs and constructed a parking garage, Garage Site I, on that land. At the time of the sale, the plaintiffs negotiated with the City concerning the City's desire to acquire a second parcel of the plaintiffs' land on which to build additional parking facilities and the plaintiffs' desire to erect an office building in the airspace over the proposed parking garage on the second parcel of land (Garage Site II–A). Those negotiations fell through and eventually resulted in the suit in which the plaintiffs allege, in part, violations of state and federal antitrust statutes.

In Counts 7 through 10, the plaintiffs have alleged that GSH has violated the Sherman Act and the Virginia Antitrust Act. The alleged violations were said to be brought about when the City entered into an agreement with GSH (the "GSH/City Agreement") for the development of a new office building known as the Virginia World Trade Center. The economic inducement or "blackout" agreement embodied in paragraph 15 of the GSH/City Agreement provided that for a period of time not to exceed two years from the start of construction, the City would not construct, permit the construction of, or provide financial support for the construction of any hotel or office building of a certain size on land or within air space owned by either the City or the NRHA within a certain portion of downtown Norfolk.

GSH supports their motion for summary judgment with two separate and distinct doctrines. These two doctrines are the State Action Doctrine and the *Noerr-Pennington* Doctrine.

### FEDERAL ANTITRUST CLAIMS— COUNTS 7 AND 8

In Counts 7 and 8, the plaintiffs have alleged that GSH has violated the Sherman Act. 15 U.S.C. §§ 1 and 2. GSH supports their motion for summary judgment with two separate and distinct doctrines. These

two doctrines are the State Action Doctrine and the *Noerr-Pennington* Doctrine. This Court would only have to find one of the doctrines applicable to grant GSH's motion for summary judgment. Although the parties are in dispute as to the law, there is no real controversy as to the facts in this case. Therefore, the Court will limit the scope of its examination to the applicable case law.

■ The state action doctrine was established by the Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The rationale for *Parker* was that the Sherman Act was not intended to apply to actions undertaken by the state legislature. Until recently, it was questionable whether state action immunity was available to actors other than the state itself. However, through elaboration in recent caselaw, the right of a private entity to claim state action immunity is indisputable. *State of North Carolina v. P.I.A.. Asheville, Inc.*, 740 F.2d 274, 276–77 (4th Cir.1984); *citing Bates v. State Bar of Arizona*, 433 U.S. 350, 362, 97 S.Ct. 2691, 2698, 53 L.Ed.2d 810 (1977) and *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). Furthermore, a private entity is able to claim state immunity even when the state does not compel, but only authorizes the activity. *Hoover v. Ronwin*, —— U.S. ——, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984).

■ For a private entity to qualify for state action immunity, they must show two things. First, there must be a "clearly articulated state policy." 740 F.2d at 277. Second, there must be active or "ongoing state supervision." *Id.*

■ The first stage of this two-part test, a clearly articulated state policy, has already been decided by this Court in its opinion filed July 18, 1984. In that opinion concerning a summary judgment motion filed by the City of Norfolk in this same action, this Court found the following:

In its declarations, the state legislature expressly stated that the problems of urban blight required governmental action. Thus the state concluded that private enterprise alone could not solve the problem. Accordingly, the state gave Housing and Redevelopment Authorities and cities vast powers to acquire land, clear it, determine appropriate land use for different parcels, impose conditions and limitations under which property may be redeveloped by public or private enterprise, and generally plan the redevelopment of an entire area. Va.Code §§ 36–48 through 36–55. Clearly the legislature contemplated that the redevelopment plan would contain anticompetitive measures similar to the challenged "blackout" agreement. The legislature must have contemplated that the City would try to encourage private developers to invest heavily in redevelopment and that as part of that encouragement the City would agree not to aid in building competing structures.

. . . . .

Accordingly, the Court FINDS that the legislature contemplated the allegedly anticompetitive activities challenged in this case when it authorized the City to become involved in redevelopment projects. Therefore, the Court HOLDS that the City was acting pursuant to a clearly articulated and affirmatively expressed state policy to displace competition in redevelopment projects.

This leads this Court to examine the second stage of the test, active state supervision. The purpose of state supervision is to monitor the conduct of the private entity to assure that its activity is in harmony with the expressed goals of the state. It is the contention of the plaintiffs that the state must actively supervise the activity and that responsibility cannot be delegated to a city. The plaintiffs cite as authority to this proposition the case of *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). However, it is the opinion of this Court that the fact situation surrounding *Lafayette* is completely different and distinguishable from the case before this Court. Furthermore, this Court is of the opinion that even if *Lafayette* was not distinguishable, it does not stand for the proposition of law which the plaintiffs contend.

In *Lafayette,* the state did not articulate or affirmatively express any state policy which authorized or empowered the city to displace competition. In other words, no power was ever transferred from the state to the city. However, in the case before this Court, the state has clearly articulated its policy and empowered the city to carry out that policy. It would make little sense to require a state to invest its limited resources in supervisory functions that are best left to the city, especially after the state has given the city other powers to carry out state policy. Accordingly, this Court holds that city supervision is synonymous with state supervision in this fact scenario.

This leaves the Court to determine whether the City actively supervised the activity of GSH. Since the economic inducement or "blackout" agreement was only in operation for a two-year period, that is the time period in which active supervision by the City was required. In deciding if there was active supervision by the City, this Court looks to the agreement entered into by the City and GSH. In the agreement, there are numerous references to supervisory functions which are carried out by the City. Specifically, paragraphs 1, 2, and 15 set out construction deadlines, leasing conditions and square footage requirements which the City enforces. With these facts in mind, this Court finds that the active state supervision requirement, the second step, was satisfied by the City's involvement under the agreement. Accordingly, this Court FINDS that GSH has met the requirements set out in *P.I.A. Asheville* and is entitled to state action immunity. This finding is in harmony with the reasoning of this Court that there would be little point in the legislature authorizing activities by the City to encourage private developers to engage in urban renewal activities, when those very activities can subject the private developer to antitrust liability.

### 2. NOERR–PENNINGTON DOCTRINE

In the cases of *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the United States Supreme Court held that genuine efforts by private parties to influence governmental action constitute immune activity under the federal antitrust laws. Furthermore, private entities can inform and attempt to influence the government of their wishes with regard to actions which the government has the power to take, even though the actions taken by the private entities are intended to restrain competition. 365 U.S. at 137, 81 S.Ct. at 529. As noted earlier in this opinion, this Court has found that the City had the power to take the actions challenged in the antitrust counts, and that those actions constituted state action under the *Parker* doctrine.

Put in the proper prospective, the challenged activities of GSH are essentially successful efforts to induce the City to take lawful state action. Under the *Noerr-Pennington* doctrine, such activities are beyond the scope of the Sherman Act. *Hopkinsville Cable T.V. v. Pennroyal Cablevision, Inc.,* 562 F.Supp. 543 (D.Ky. 1982) involved a similar fact situation. In that case, the court held the actions of the city to be within the scope of the *Parker* doctrine, and then held that the "[defendant] and its shareholders are similarly shielded from antitrust liability by the *Noerr-Pennington* doctrine." *Id.* at 546. The court went on to say that "construing the allegations of Hopkinsville Cable's complaint liberally, it asserts nothing more than Pennyroyal sought to obtain a monopoly from city. This is precisely the type of conduct that *Noerr-Pennington* protects. *Id.* Accordingly, this Court FINDS that GSH has met the criteria to fall within the *Noerr-Pennington* doctrine and is therefore shielded from antitrust liability.

As GSH has met the requirements of both the *Parker* doctrine and the *Noerr-Pennington* doctrine, summary judgment is GRANTED in favor of Goodman-Segar-Hogan, Inc. on Counts 7 and 8.

### VIRGINIA ANTITRUST CLAIMS–Counts 9 and 10

In Counts 9 and 10, the plaintiffs have alleged that GSH has violated the Virginia

Antitrust Act. Va.Code § 59.1–9.1, *et seq.* The *Parker* and *Noerr-Pennington* doctrines which foreclosed liability under the federal antitrust act forecloses liability under the Virginia antitrust act. Moreover, the Virginia antitrust act excludes any activity which is authorized by a Virginia statute. Va.Code § 59.1–9.4(b)(1). As this Court has already concluded that the activities of GSH and the City were authorized, the statutory exclusion, which is broader because it does not require a clearly articulated and affirmatively expressed state policy, must also apply. Therefore, the Court GRANTS the motion of Goodman-Segar-Hogan, Inc. for summary judgment on both Counts 9 and 10.

## CONCLUSION

This Court, having dismissed all of the federal antitrust claims, invites counsel to brief the issue of whether this Court now has jurisdiction over the remaining claims. Counsel should file simultaneous briefs within fifteen days of the date of this Order.

IT IS SO ORDERED.